## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **BRYCE LEE DUNCAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 14-1187-JWL** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying Supplemental Security Income (SSI) benefits under sections 1602, and 1614(a)(3)(A) of the Social Security Act. 42 U.S.C. §§ 1381a, and 1382c(a)(3)(A) (hereinafter the Act). Finding no error, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

## I.      Background

Plaintiff applied for SSI, alleging disability beginning July 13, 2011. (R. 14, 297-303). Plaintiff exhausted proceedings before the Commissioner, and now seeks judicial review of the final decision denying benefits. Plaintiff presents five issues for consideration (Pl. Br. 4-5), but his brief does not precisely track the issues presented. The

court perceives allegations of error in relation to the ALJ's step two evaluation, the evaluation of the medical source opinion of APNR Njoku, the step three evaluation of the mental listings, the hypothetical questioning of the vocational expert, the credibility determination, and the alleged failure to develop the record regarding a consultative psychiatric examination.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether she applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not

simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. § 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's residual functional capacity (RFC).  20 C.F.R. § 416.920(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process--determining at step four whether, in light of the RFC assessed, claimant can perform his past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of

past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord,

Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.

At step five, the burden shifts to the Commissioner to show that there are jobs in the

economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084,

1088 (10th Cir. 1999).

The court addresses each argument in the order it would be reached in applying the

sequential evaluation process, beginning with Plaintiff's allegation of error in evaluating

the severity of his mental impairments at step two of the sequential process.

## II.     The Step Two Determination

Plaintiff first argues that the ALJ correctly found that Plaintiff's affective disorder

and anxiety disorder are severe, but that she erred in relying on Plaintiff's function report

to find that "[i]n activities of daily living, the [plaintiff] has no more than mild

restrictions."  (Pl. Brief 6) (quoting R. 18).  He argues that in making a severity finding an

ALJ must rely upon psychiatric or psychological evaluations; (Pl. Brief) (citing Caldwell

v. Sullivan, 736 F. Supp. 1076 (D. Kan. 1990); Sears v. Bowen, 840 F.2d 394 (7th Cir.

1988); and De Leon v. Sec'y of H.H.S., 734 F.2d 930 (2nd Cir. 1984)); and that in any

case an ALJ may not "cherry-pick" within Plaintiff's statement, but must accept it in it's

entirety.  (Pl. Br. 6-7).

Plaintiff is in error to assert that a severity finding with regard to mental

impairments must be based on psychological or psychiatric evaluations or even to assert

that it must be based primarily on medical evidence of any kind.  The cases to which

Plaintiff cites in support of this assertion do not support his proposition.  First, none of the cases contains a pinpoint citation so that the court might find the applicable portion of the opinion cited.  Nevertheless, the court searched through each of the opinions cited and was unable to ascertain a basis for Plaintiff's assertion.

The De Leon opinion comes the closest to suggesting the proposition asserted by Plaintiff (that an ALJ must use psychiatric or psychological evaluations rather than a claimant's testimony to determine the claimant's functional limitations), but that is not the holding of the De Leon court.  In that case, the ALJ "determined that De Leon 'does not have a severe mental or psychological impairment,'" and terminated his SSI benefits on that basis.  De Leon, 734 F.2d at 933-34.  The court held, on the other hand, that "the evidence that De Leon suffers from severe psychological and mental impairments is overwhelming."  Id. at 934.  And that "the record does not contain substantial evidence to support the Secretary's contrary conclusion."  Id.  The court recognized that in certain cases involving mental impairments the demeanor and appearance (and potentially the testimony) of the claimant at the hearing "really do not contribute toward meeting the substantial evidence burden," and found that "[h]owever De Leon may have appeared at his hearing, we cannot ignore the overwhelming evidence that he has severe, disabling psychological and other problems."  Id. 734 F.2d at 935.  Thus, the De Leon court's holding was not that a claimant's allegations regarding functional limitations could never be utilized in evaluating the severity of mental impairments, but that in the circumstances of that case, the other evidence was overwhelming.

Moreover, none of the cases cited by Plaintiff is from a court whose precedent is binding on this court.  When citing opinions such as these, which are relevant to this court only for their persuasive value, it becomes all the more import for Plaintiff to provide pinpoint citations, and argument or explanation why that court reached a proper decision or a decision which would be required in the Tenth Circuit.  None of that is present here.

Finally, the Commissioner has provided a special technique for evaluating the severity of mental impairments in a Social Security decision, and that technique provides for consideration of "all relevant evidence," and specifically refers to sections 12.00C through 12.00H of the Listing of Impairments for information about the factors to be considered in evaluating functional limitations resulting from mental impairments.  20 C.F.R. § 416.920a(c).  The Listing of Impairments specifically provides that "Information from the individual" is one source of evidence to be used in evaluating an individual's functional limitations.  20 C.F.R., Pt. 404, Subpt. P, App. 1 §12.00D(1)(b).

Plaintiff's argument that an "ALJ cannot 'cherry-pick' a lay report anymore [sic] than she can a medical report" (Pl. Br. 6), but that she "must accept plaintiff's self-report in its entirety," id. at 7, is likewise unpersuasive.  Each of the cases cited as authority for this assertion stands either for the proposition that an ALJ may not pick and choose through a particular uncontradicted medical opinion, selecting the portions that support her decision but ignoring the contrary portions; Haga v. Astrue, 482 F.3d 1205, 1208 (10th Cir. 2007); Moore v. Barnhart, 114 F. App'x. 983, 994 (10th Cir. 2004); or that an ALJ may not pick and choose among several medical opinions using those that support

6

her decision while ignoring those that are contrary.  Carpenter v. Astrue, 537 F.3d 1264,

1265 (10th Cir. 2008).  Plaintiff provides neither argument nor authority that the rule with

regard to medical reports or medical opinions should be extended to a claimant's

testimony or reports.  He provides no other basis for his assertion that the ALJ must

accept Plaintiff's self-report in its entirety.  This assertion is soundly contradicted by the

fact that an ALJ is specifically required to evaluate the credibility of a claimant's

allegations--she need not accept or reject all of the allegations together.  The ALJ

considered Plaintiff's allegations and found them "not entirely credible."  (R. 19).

Plaintiff provides an argument presumably suggesting error in the ALJ's use of

global assessment of functioning (GAF) scores in evaluating the severity of Plaintiff's

mental impairments.  (Pl. Br. 8-10); see also (Pl. Br. 2-4) (purporting to show GAF scores

in the medical evidence assigned to Plaintiff's condition).  This argument is quite

confusing to the court.  First, the court does not understand why it is included in

Plaintiff's arguments regarding "Step 2: severity/non-severity of medical impairments,"

because all of the ALJ's references to GAF scores appear, not in her step 2 analysis, but

in her assessment of Plaintiff's RFC, under finding number 4 in her decision.  (R. 18-22).

Moreover, Plaintiff's argument is not supported by the record.  Plaintiff asserts that

the ALJ "overlooked or ignored" GAF scores of 50 or 51 assigned on February 6, 2001,

January 3, 2002, December 14, 2010, June 27, 2011, August 25, 2011, January 30, 2012,

and July 23, 2012.  (Pl. Br. 8-9).  Two of the GAF scores to which Plaintiff appeals were

assigned more than nine years before Plaintiff submitted his SSI application at issue here-

-February 6, 2001, and January 3, 2002.  (R. 409, 421).  They are not relevant to a determination whether Plaintiff is disabled on or after July 13, 2011.  As to the five scores which are relevant to this disability determination, the evidence confirms that the ALJ considered them.

In the decision, the ALJ noted that the "records indicate that the claimant does have a history of complaint of anxiety and difficulty controlling his anger," but that "treatment notes consistently indicate that the claimant was generally assessed GAF ratings above 50, indicating only moderate symptoms."  (R. 21) (citing Exs. 11F and 15F, R. 313-736, 758-94).  Those records which are within the relevant time frame for disability determination in this case reveal GAF scores which were assigned as follows-- 12/10/2010 - 50 (R. 527, 640); 06/27/2011 - 51 (R. 538, 632); 08/25/2011 - 51 (R. 549, 627); 11/07/2011 - 52 (R. 622); 01/30/2012 - 54 (R. 617); 04/09/2012 - 54 (R. 791); 06/11/2012 - 50 (R. 786); 07/23/2012 - 50 (R. 777); 09/17/2012 - 55 (R. 765).  The record reveals GAF scores in as low as 32 (R. 677) and as high as 50 (R. 692, 736) in 2003, 2004, and 2005.  (R. 661-736).  In 2009, Plaintiff underwent another course of treatment and was assigned GAF scores of 58 (R. 654, 658) and 60.  (R. 646, 651).  However, the court notes that these scores, assigned in June 2009 and earlier, are outside the applicable time frame for consideration of disability in this case, and were therefore properly ignored by both the ALJ and this court in deciding the issues here.  The nine relevant GAF scores include three scores of 50 and the two scores of 51 cited by Plaintiff.  And, as the ALJ found, Plaintiff was "generally" assessed GAF scores above 50 on six of these nine

occasions, including the two occasions a score of 51 was assessed.  The significance of

GAF scores above 50 is that the <u>Diagnostic and Statistical Manual of Mental Disorders</u>

provides that GAF scores in the range from 41 to 50 indicate "**Serious symptoms** (e.g.,

suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious**

**impairment in social, occupational, or school functioning** (e.g., no friends, unable to

keep a job)," whereas GAF scores in the range of 51-60 indicate only "**Moderate**

**symptoms** . . . **OR moderate difficulty in social, occupational, or school functioning.**"

Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders</u>

(hereinafter DSM-IV-TR) 34 (4th ed. text revision 2000). (emphases in original).

Therefore, as the ALJ correctly stated, the GAF scores in the relevant period generally

"indicated only <u>moderate</u> symptoms."  (R. 21) (emphasis added).

Plaintiff characterizes the ALJ as "arguing" that Plaintiff's "allegation of fear of

large crowds and being paranoid around people is belied by his group therapy notes

showing good mood and affect, with appropriate behavior."  (Pl. Br. 10).  He then implies

that this is error because group therapy was a very controlled environment, because it

cannot be compared to large crowds or agoraphobia, and because the ALJ ignored a

treatment note allegedly demonstrating that Plaintiff cannot be in large crowds and that

his conduct is long-standing.  <u>Id.</u>  The analysis to which Plaintiff refers was but one of

seven reasons relied upon by the ALJ in finding Plaintiff's allegations of symptoms are

not credible.  Here is what the ALJ said:

> In evaluating persuasiveness of testimony, the undersigned notes that there are inconsistencies between the claimant's allegations and the medical evidence of record.  For example, the claimant testified that he has a problem around large crowds and that he gets paranoid around people.  However, group therapy notes from Comcare consistently indicated that the claimant was actively engaged in treatment, including encouragement and articulation of problem-solving tools, and that he presented with a good mood and affect, and appropriate behavior (Exhibit 15F).

(R. 21).  The ALJ found that Plaintiff's ability to actively engage in such a positive manner in group therapy suggests that his paranoia around people and his problem with large crowds, although significant, is not disabling and is therefore not as severe as alleged by Plaintiff.  It is true that the ability to engage actively in group therapy does not underline preclude problems with large crowds or paranoia around people.  But, that is not what the ALJ found.  As the ALJ found, this is evidence tending to suggest that Plaintiff's limitations are not as severe as Plaintiff alleges.  The court will discuss the ALJ's credibility determination more fully later in this opinion, but Plaintiff has not shown error in the ALJ's reliance on this as one factor in that determination.  The court will also address Plaintiff's allegations of error in evaluating APRN[1] Njoku's opinions later.

---

[1]Plaintiff addresses Ms. Njoku as APRN (Advance Practice Registered Nurse), calls her a "specialty nurse" (Pl. Br. 13), and cites treatment records in which Ms. Njoku is listed as an APRN.  (Pl. Br. 7 & n.9).  The ALJ addressed Ms. Njoku as ARNP, calls her a nurse practitioner, and cites to her medical source statement which she signed as an ARNP (Advanced Registered Nurse Practitioner).  (R. 21, 800).  The court finds that both are correct, and for ease, refers to her as APRN Njoku, Nurse Practitioner.

Before January 1, 2012, the state of Kansas Board of Nursing provided "certificates of qualification" to ARNP's, but the Kansas statutes changed effective January 1, 2012, changing the title to APRN, providing licensure rather than certification, and providing for APRN "roles" rather than "categories," but retaining the four former "categories" as the only four "roles" for an APRN:  Clinical Nurse Specialist, Nurse

Plaintiff's step two arguments (and, in fact, most of the arguments in his Brief) do little to show error in the ALJ's decision.  He does not demonstrate that the ALJ's findings are not supported by the record evidence or that she applied the incorrect legal standard in reaching her decision.  Rather, he suggests what, in his view, the evidence demonstrates.  It is not the court's duty to determine de novo what the evidence demonstrates or what would be the best decision based on the facts of the case.  All of that would require the court to reweigh the evidence, and as noted above, it is prohibited from pursuing that course.  Bowman, 511 F.3d at 1272; accord, Hackett, 395 F.3d at 1172.  Plaintiff has shown no error in the ALJ's step two determination.[2]

### III.    Medical Source Opinions of APRN Njoku

---

Anesthetist, Nurse Midwife, and Nurse Practitioner.  Available online at: http://www.ksbn.org/advpractice.htm last visited April 23, 2015.

[2]The Commissioner notes that in footnote four at page 6 of his Brief, Plaintiff asserts that the ALJ erred at step two in failing to find Personality Disorder (Listing 12.08) to be a severe impairment in this case, and states that he will discuss Listing 12.08 later in his Brief.  She argues that this alleged error should not be considered because it was never developed and has not been adequately briefed.  (Comm'r Br. 8).

The court agrees.  Plaintiff seems also to suggest an error in this regard in the title to one section of his Brief.  (Pl. Br. 14) ("Step 3 medical evaluation re Listings 12.04, 12.06 &12.08") (bolding omitted).  However, other than baldly asserting that Nurse Practitioner Njoku's opinion demonstrates that Plaintiff meets Listing 12.08 (Pl. Br. 7), and that Plaintiff should be granted benefits because he meets, among others, Listing 12.08, he does not develop any argument demonstrating error in the ALJ's determination that Plaintiff's Personality Disorder is not a severe impairment.

Because Plaintiff has failed to support his allegation of error with "developed argumentation," he has waived that issue.  Wall v. Astrue, 561 F.3d 1048, 1065 (10th Cir. 2009) (quoting Hardeman v. City of Albuquerque, 377 F.3d 1106, 1122 (10th Cir. 2004; and citing Christian Heritage Acad. v. Okla. Secondary Sch Activities Ass'n, 483 F.3d 1025, 1031 (10th Cir. 2007)).

The ALJ stated that she had

> considered the medical source statements completed on October 30, 2012 by the claimant's nurse practitioner Mariam Njoku, ARNP, in accordance with Social Security Ruling 06-03p (Exhibit l6F [R. 795-800]).  While the undersigned finds Ms. Njoku to be a health care provider who is not an acceptable medical source, the undersigned also finds her assessment of the claimant inconsistent with reports that depict activities that showed greater capacity than expressed in her report.
>
> On her source statement, Ms. Njoku gave the claimant extensive limitations in a number of areas.  However, this opinion is without support from the other evidence of record, which renders it less persuasive.  For example, although Ms. Njoku opined that the claimant "often" had deficiencies of concentration and repeated episodes of decompensation, such limitations do not appear consistent with the results of examinations given throughout the course of treatment at Comcare, which generally indicate the claimant presented as alert and oriented, with appropriate behavior and an articulate thought process (Exhibit 15F[R. 758-94]).  Further, these extensive limitations do not correlate with the claimant's recent behaviors during his weekly group sessions, or with Ms. Njoku's assessment of a GAF rating of 55, indicative of only moderate symptoms (Exhibit l5F/8 [R. 765]).
>
> While the claimant has some limitation in social interaction and concentration, they are of only a moderate nature.  As the limitations assessed by Ms. Njoku are inconsistent with the evidence of record, her opinion is given <u>little weight</u>.

(R. 22) (emphasis added).

As the ALJ recognized, Social Security Ruling (SSR) 06-03p provides the

procedure for evaluating the opinions of medical sources such as Nurse Practitioner

Njoku, who are not "acceptable medical sources."  (R. 21); <u>see also</u>, West's Soc. Sec.

Reporting Serv., Rulings 327-34 (Supp. 2014).  In SSR 06-03p, the Commissioner noted:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and

> licensed clinical social workers, have increasingly assumed a greater
> percentage of the treatment and evaluation functions previously handled
> primarily by physicians and psychologists. Opinions from these medical
> sources, who are not technically deemed "acceptable medical sources"
> under our rules, are important and should be evaluated on key issues such as
> impairment severity and functional effects, along with the other relevant
> evidence in the file.

West's Soc. Sec. Reporting Serv., Rulings, 330-31.

SSR 06-3p explains that such opinions will be evaluated using the regulatory factors for evaluating medical opinions; id. at 331-32 (citing 20 C.F.R. § 416.927); and explains that the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id. at 333; see also Frantz v. Astrue, 509 F.3d 1299, 1302 (10th Cir. 2007) (remanding for consideration of a nurse-practitioner's opinions in light of SSR 06-03p).

That is the procedure the ALJ applied in this case, as the quotation above reveals. The ALJ provided at least four reasons to discount Nurse Practitioner Njoku's opinion. She is not an acceptable medical source, her opinion that Plaintiff "often" had deficiencies of concentration and repeated episodes of decompensation is not consistent with the results of examinations throughout the course of treatment at Comcare, her significant limitations did not correlate with Plaintiff's recent behaviors at group therapy sessions, and the limitations do not correlate with Nurse Practitioner Njoku's assessment

of a GAF score of 55 on September 17, 2012.  (R. 22).  Each of these reasons is supported by record evidence.

Plaintiff's argument that because Ms. Njoku is a "specialty nurse" it is impermissible to reject her opinion "just because she is not an acceptable medical source" (Pl. Br. 13), is without merit.  The ALJ did not reject Nurse Practitioner Njoku's opinion "just" because she is not an acceptable medical source; she specifically acknowledged the requirements of SSR 06-03p, and she provided at least three additional reasons to discount the opinion.  To the extent Plaintiff is arguing that it is impermissible to use that fact as any part of the basis to discount such opinions, he ignores the SSR itself, which recognizes that such medical care providers as nurse practitioners "are not technically deemed 'acceptable medical sources' under our rules."  SSR 06-03p, West's Soc. Sec. Reporting Serv., Rulings, 330.

Plaintiff implies that the ALJ's finding that Nurse Practitioner Njoku's opinions are "without support from the other evidence of record" (R. 22) is contradicted by Comcare treatment notes in Exhibit 4F (R. 518-41).  (Pl. Br. 13) ("Did the ALJ not review Exhibit 4F from Comcare?").  But, Plaintiff points to nothing in Exhibit 4F which specifically supports Nurse Practitioner Njoku's opinions, and specifically, he does not demonstrate that the four reasons given by the ALJ for discounting her opinions are erroneous.  Plaintiff asserts that Plaintiff's mental health status in December 2010 was "quite severe," that those treatment notes referred back to notes from September 2004, that he was assessed a GAF score of 50 on December 10 and December 17, 2010, and

that Dr. Grimsley assessed him with a GAF of 50 on June 27, 2011.[3]  (Pl. Br. 13).  To be sure, the "Intake Summary" form completed on December 10, 2010 included a quotation from the "Presenting Complaints" section of an intake summary prepared on Plaintiff at Comcare on September 23, 2004 (R. 521-22) and quotations from the "Family History" and "Marital History" section of another intake summary prepared on Plaintiff at Comcare on March 23, 2009.  (R. 523).  But, Plaintiff's condition on any one day, particularly a day on which he is beginning a course of treatment does not necessitate a finding of disability.  Moreover, the quotations from years earlier, although they do provide a framework for considering Plaintiff's current condition, do not suggest that Plaintiff's current condition is of the same severity as his condition was earlier.  Their purpose is apparently to provide a frame of reference, to save time in reproducing historical details which may be the same as or similar to information prepared earlier, and to inform subsequent Comcare providers that Plaintiff has been treated at Comcare before.  Finally, the fact that Dr. Grimsley assigned a GAF score of 51 (not 50 as alleged by Plaintiff, see footnote 3 above) after just six months of treatment indicates that Plaintiff's condition was already improving.  (R. 538).  This fact is significant because, as a mental healthcare provider Dr. Grimsley is aware that a GAF score of 50 indicates

─────────────

[3]The document to which Plaintiff's Brief cites is a "Diagnosis" form signed by Dr. Grimsley on June 27, 2011, and it does refer to an Axis 5 (GAF) score of 50 assigned "On Admission."  534-35.  However, Dr. Grimsley's "Medication Review" note signed the same day clarifies the situation.  It reveals that Plaintiff had a GAF score of 50 assigned "On Admission," which was "Effective as of:  12/10/2010."  (R. 537).  But, on the day of the "Medication Review" Dr. Grimsley assigned a GAF score of 51.  (R. 538).

"serious" symptoms whereas a GAF score of 51 indicates only "moderate" symptoms. DSM-IV-TR 34.  The facts asserted by Plaintiff do not require a finding that the ALJ erred in discounting Nurse Practitioner Njoku's opinion.

Plaintiff argues that the ALJ was impermissibly "cherry-picking" when he used Nurse Practitioner Njoku's GAF score of 55 to find that Plaintiff is not disabled "while ignoring her other positive findings in the Record."  (Pl. Br. 8).  This argument forgets the rule concerning picking and choosing within a medical source's opinion, and ignores what the ALJ actually did when he used that GAF score.  The rule is that an ALJ may not pick and choose through an uncontradicted medical opinion, selecting the portions that support her decision but ignoring the contrary portions.  Haga, 482 F.3d at 1208; Moore, 114 F. App'x. at 994.  This rule is not violated here for two reasons.  First, Nurse Practitioner Njoku's opinion is not uncontradicted.  The opinions of the State agency psychologist and psychiatrist who reviewed the record are contrary to the opinion of Nurse Practitioner Njoku, the ALJ accorded these opinions significant weight, and other than to assert that Dr. Schulman did not have the benefit of the most recent treatment records or of Nurse Practitioner Njoku's opinion, Plaintiff does not argue error in the determination to accord significant weight.  Plaintiff's terse assertion that "[o]nly [Dr.] Schulman, a Ph.D. is relevant for purposes of this appeal," ignores that although Dr. Reed is a medical doctor, she provided the Psychiatric Review Technique and Mental Residual Functional Capacity Assessment at the reconsideration level in this case.  (R. 232-36). Therefore, lacking contrary evidence, which Plaintiff has not presented, the court finds

that the circumstances justify the inference that Dr. Reed is a mental healthcare specialist, likely a psychiatrist.  This is the same inference the court has drawn in this case with regard to Dr. Grimsley.  Moreover, in a search on the Kansas Board of Healing Arts web site, the court has noticed a profile of a Robin R. Reed, M.D. with a specialty in Psychiatry, and an address in Topeka, Kansas.  <u>Available at</u>:

https://www.accesskansas.org/ssrv-ksbhada/details.html?id=11333, last visited April 23, 2015.

Second, and most importantly, Plaintiff has shown no portion of Nurse Practitioner Njoku's opinion which was ignored by the ALJ.  Plaintiff forgets that the ALJ specifically compared Nurse Practitioner Njoku's GAF score with her opinion and determined that the opinion was contrary to the GAF score, and for that reason (among others) she decided to give the opinion "little weight."  Moreover, the GAF score of 55 was assigned by Nurse Practitioner Njoku on September 17, 2012, at the last Comcare "Medication Management Document" in the record (R. 761-66), and about one month before she signed the medical source statement, and there is no record evidence or allegation of any worsening of Plaintiff's condition after September 17, 2012 but before Nurse Practitioner Njoku prepared her medical source statement.  Further, the ALJ found that the opinion was contrary to Plaintiff's "recent behaviors during his weekly group sessions," and those sessions occurred between August 6, 2012, and October 1, 2012 (R. 758-71), the latest of which was also about a month before Nurse Practitioner Njoku signed the medical source statement.  Plaintiff has shown no error in the ALJ's evaluation of Nurse Practitioner Njoku's opinion.

17

## IV.   Step Three Errors

Section C of Plaintiff's Brief purports to allege errors at step three of the sequential evaluation process regarding Listings 12.04, 12.06, & 12.08.  The question at step three of the process is whether a claimant has an impairment that meets or equals a Listed Impairment.  20 C.F.R. § 416.920(a)(4)(iii).  Therefore, by implication from the title of this section Plaintiff appears to argue that the ALJ erred in finding that Plaintiff has no impairment or combination of impairments that meets or equals the severity of a Listed Impairment.  However, there is absolutely no argument in this or any other section of the Brief suggesting any basis for such an allegation.  The entirety of the argument in this section concerns an allegation that the ALJ failed in her duty either to develop the record or to recontact Nurse Practitioner Njoku.  Those arguments will be addressed later in this opinion when the court considers Plaintiff's allegation that the ALJ should have ordered a consultative examination.  As noted above at footnote 2, a Plaintiff who fails to support an allegation of error with "developed argumentation," has waived that issue.  Wall v. Astrue, 561 F.3d 1048, 1065 (10th Cir. 2009) (quoting Hardeman, 377 F.3d at 1122; and citing Christian Heritage Acad., 483 F.3d at 1031.  Plaintiff has waived the issue of error at step three.

## V.   Credibility Determination

Plaintiff alleges error in the ALJ's credibility determination at two places in his Brief.  First, he argues among his step two arguments that the ALJ attacked Plaintiff's credibility on four fronts:  compliance with treatment, work history and incarceration,

applying for disability while looking for work, and participation in group therapy sessions

which is indicative of an ability to function at the level of past work.  (Pl. Br. 11-12)

(citing R. 21-22).  Then, he argues in a separate section of his Brief that the ALJ failed to

apply the correct legal standard to her credibility determination because she cited "no

facts in the record to justify rejecting plaintiff's [sic] testimony."  (Pl. Br. 19).  The

Commissioner argues that there is no merit to Plaintiff's claim, that the ALJ applied the

correct standard to evaluate credibility, that there is no requirement for a formalistic

factor-by-factor recitation of the evidence, and that substantial evidence supports the

credibility determination.  (Comm'r Br. 21-23).

### A.    The ALJ's Findings

The ALJ summarized the standard for evaluating the credibility of Plaintiff's

allegations in her RFC analysis.  (R. 19).  She then summarized Plaintiff's allegations, id.,

stated her determination that Plaintiff 's allegations are not entirely credible, and

summarized the medical evidence.  Id. at 19-20.  She noted that 20 C.F.R. § 416.929(c)

and SSR 96-7p describe the kind of evidence to be relied upon, and the factors to be

considered in making a credibility determination, and summarized those factors.  (R, 20).

In the following page and a quarter, she explained at least seven reasons to discount the

credibility of Plaintiff's allegations of disabling symptoms:  Plaintiff's allegations are not

supported by the objective medical evidence, and are not supported by the examination

findings; there are inconsistencies between Plaintiff's allegations and the record medical

evidence; Plaintiff testified that he frequently isolates himself for up to three or four days

19

at a time, but the medical records do not contain evidence that he reported such limitations; there is evidence Plaintiff was non-compliant with medications or treatment recommendations; generally statements made for the purpose of receiving treatment are usually more reliable than those made to receive disability benefits; and Plaintiff's work history does not support the credibility of his allegations of disabling complaints.  Id.  (R. 20-22).

## B.    Legal Standard for a Credibility Determination

The framework for a proper credibility analysis is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987).  An ALJ must consider (1) whether the claimant has established a symptom-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's symptoms are in fact disabling.  See, Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993) (explaining the Luna framework).  The Commissioner has promulgated regulations suggesting relevant factors to be considered in evaluating credibility:  Daily activities; location, duration, frequency, and intensity of symptoms; factors precipitating and aggravating symptoms; type, dosage, effectiveness, and side effects of medications taken to relieve symptoms; treatment for symptoms; measures plaintiff has taken to relieve symptoms; and other factors concerning limitations or restrictions resulting from symptoms.  20 C.F.R. § 404.1529(c)(3)(i-vii).  The court has

recognized a non-exhaustive list of factors which overlap and expand upon the factors

promulgated by the Commissioner.  Luna, 834 F.2d at 165-66.  These factors include:

> the levels of medication and their effectiveness, the extensiveness of the
> attempts (medical or nonmedical) to obtain relief, the frequency of medical
> contacts, the nature of daily activities, subjective measures of credibility
> that are peculiarly within the judgment of the ALJ, the motivation of and
> relationship between the claimant and other witnesses, and the consistency
> or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

The court's review of an ALJ's credibility determination is deferential, and that

determination is generally treated as binding on review.  Talley v. Sullivan, 908 F.2d 585,

587 (10th Cir. 1990); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983).

"Credibility determinations are peculiarly the province of the finder of fact" and will not

be overturned when supported by substantial evidence.  Wilson, 602 F.3d at 1144; accord

Hackett, 395 F.3d at 1173.  "However, '[f]indings as to credibility should be closely and

affirmatively linked to substantial evidence and not just a conclusion in the guise of

findings.'"  Wilson, 602 F.3d at 1144 (quoting Huston v. Bowen, 838 F.2d 1125, 1133

(10th Cir. 1988)); Hackett, 395 F.3d at 1173 (same).

**C.     Analysis**

Plaintiff's argument that the ALJ applied the incorrect legal standard because she

did not cite evidence demonstrating the inconsistencies in Plaintiff's allegations is

undermined by her earlier argument that the ALJ based her credibility finding on four

bases.  The bases cited as erroneous by Plaintiff rest upon evidence of non-compliance, a

poor work history, long incarceration, and of looking for work after having applied for disability. The Commissioner provided citation to record evidence supporting each of these findings by the ALJ, and in her Reply Brief Plaintiff did not argue error in these citations. To the extent that Plaintiff claims that it was error for the ALJ to fail to cite to specific record evidence demonstrating the basis for each of her reasons for discounting the credibility of Plaintiff's allegations, that is not the standard to be applied. To be sure, the Tenth Circuit has held that findings as to credibility should be closely and affirmatively linked to substantial evidence, but that does not mean that each finding must be supported in the decision by a citation to specific record evidence. The ALJ here affirmatively linked her credibility findings to substantial evidence by stating the evidence that supported her findings. For example, the ALJ stated that treatment notes generally assessed GAF scores above 50 which indicated only moderate symptoms; that Plaintiff testified that he had problems around large crowds and gets paranoid around people, but that group therapy notes indicate that he was actively engaged in treatment; and that there is record evidence that Plaintiff was not compliant with medications and treatment recommendations. Each of these assertions of fact (and the others relied upon by the ALJ) affirmatively links the credibility finding to record evidence, and is verifiable on judicial review by the court's review of the evidence to determine if the Commissioner's findings are supported by substantial record evidence. The court's job in reviewing the evidence might be easier were the ALJ to cite evidence in support of each of her bases for discounting Plaintiff's allegations, but that is not the standard. But, if the

22

court can determine whether the evidence affirmatively linked by the ALJ to the findings constitutes substantial evidence supporting those findings, that is enough.

Plaintiff's arguments regarding each of the four bases she identified for the ALJ's credibility finding is merely another means to suggest that the court reweigh the evidence and reach a conclusion contrary to that of the ALJ. As noted infra, at 11, the court may not do so. Plaintiff must demonstrate the error in the ALJ's rationale or finding; the mere fact that there is evidence which might support a contrary finding will not establish error in the ALJ's determination. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations, quotations, and brackets omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). Therefore, where the ALJ has reached a reasonable conclusion that is supported by substantial record evidence, the court will not reweigh the evidence and reject that conclusion even if it might have reached a contrary conclusion in the first instance.

The court finds it necessary to address one more argument in regard to the credibility determination. Plaintiff notes that one of the ALJ's bases for discounting the credibility of Plaintiff's allegations was that the ALJ "observes as a general rule that the statements made for the purpose of receiving treatment are usually more reliable than

those made strictly in the context of a disability claim" (R. 21), and he argues that the ALJ, unfortunately, "omitted her citation to authority or learned treatise to support her naked supposition, leaving this Court [sic] to take her at her word." (Pl. Br. 12). Plaintiff misunderstands the authority upon which an ALJ may base her credibility determinations. Although the credibility determination in a Social Security case is not merely a "pure credibility determination," Luna, 834 F.2d at 166, the Tenth Circuit acknowledges that an ALJ may consider "subjective measures of credibility that are peculiarly within the judgment of the ALJ" and "the motivation of . . . the claimant." Kepler, 68 F.3d at 391.

The ALJ's statement goes beyond her findings that Plaintiff's allegations in the Social Security proceedings are inconsistent with his reports to his medical care providers, and explains her basis for assigning greater weight to the reports made to (and lesser weight to reports omitted from) medical care providers. It is a reasonable premise, that in proceedings seeking benefits or some other gain, an individual will have a motive to exaggerate his reports, or "spin," or color his story for the purpose of receiving benefits, whereas in reports to medical care providers, the potential negative effects of exaggerated or erroneous reports provide some assurance that those reports are more accurate. The ALJ need not cite legal authority or learned treatise to support that premise. It is part of her duty in considering the motivation of the claimant, and is one of those subjective measures of credibility which are peculiarly within the judgment of the ALJ. Plaintiff has shown no error in the ALJ's credibility determination.

**VI.     Recontact a Treating Physician or Order a Consultative Examination**

At three places in his Brief, Plaintiff argues that because the ALJ discounted Nurse Practitioner Njoku's opinions (that Listings 12.04, 12.06, and 12.08 are met) she either determined that those opinions are inadequate to determine disability or created an ambiguity with regard to disability which triggered her duty either to recontact Dr. Grimsley, Plaintiff's treating physician, or Nurse Practitioner Njoku, who was supervised by Dr. Grimsley, or to order a consultative examination.  (Pl. Br. 10, 14-15, 20).  The Commissioner argues that the ALJ had no duty in the circumstances of this case either to recontact the treating medical sources or to order a consultative examination.  The court agrees.

Plaintiff's assertion that the ALJ should have recontacted either Nurse Practitioner Njoku or Dr. Grimsley is without merit.  The regulations were changed effective March 26, 2012, giving adjudicators greater flexibility in obtaining information necessary to make a disability determination, and they no longer require that an ALJ first recontact a treating source to resolve an inconsistency or insufficiency in the evidence that source provides to the Social Security Administration.  How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651 (Feb. 23, 2012).  Moreover, Plaintiff has shown no basis to recontact either treating source under the standard applicable before March 26, 2012.  The problem with Plaintiff's argument in this regard is that the ALJ stated specific reasons to discount the opinion of Nurse Practitioner Njoku and did not find that her opinion contained a conflict or ambiguity that must be resolved, that it did not contain all of the necessary information, or that it was not based on medically acceptable clinical and

laboratory techniques.  Rather, she discounted the opinion because it was inconsistent with record evidence and with the GAF score of 55 assigned by Nurse Practitioner Njoku about one month earlier.  Plaintiff suggests that the ALJ's determination that her limitations were inconsistent with the GAF score Nurse Practitioner Njoku assigned, necessarily stated a conflict that must be resolved.  However, any conflict that resulted was resolved by the ALJ, and as discussed above, Plaintiff has shown no error in that resolution.  There is no need to recontact a medical source merely because the ALJ discounted that source's opinion.  With regard to Dr. Grimsley's opinion, the record reveals that to the extent she presented a medical opinion that opinion was her assessment of a GAF score of 51 on June 27, and August 25, 2011 (R. 538, 549), a score of 52 on November 7, 2011 (R. 622), and a score of 54 on January 30, and March 9, 2012.  (R. 617, 791).  The ALJ clearly accepted these assessments, because he included them within his finding that the treatment notes generally assessed GAF scores above 50.  There is no need to recontact Dr. Grimsley.

Moreover, Plaintiff does not demonstrate that the ALJ should have ordered a consultative examination.  As the Commissioner's brief suggests, the Commissioner "has broad latitude in ordering consultative examinations."  Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997).

> [But, t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised.  This is true despite the presence of counsel, although the duty is heightened when the claimant is unrepresented.  The duty is one

of inquiry, ensuring that the ALJ is informed about facts relevant to his decision and learns the claimant's own version of those facts.

Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993) (citations, quotations, and brackets omitted).  Even though the regulations were changed in 2012 and no longer require that a treating source physician be recontacted, the regulations still provide for the use of consultative examinations.  They provide that a consultative examination will not be requested until the Agency has "made every reasonable effort to obtain evidence from [claimant's] own medical sources."  20 C.F.R. § 416.912(e).  They provide that the Agency may ask the claimant "to have one or more physical or mental examinations or tests," in situations where "your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled."  Id. § 416.917.  Finally, they provide that a consultative examination may be used "to try to resolve an inconsistency in the evidence or when the evidence as an whole is insufficient to support a determination and decision on your claim."  Id. § 416.919a.  Thus, in general a consultative examination should be ordered where the claimant has provided record evidence of an inconsistency which must be resolved or where the evidence is insufficient to make a decision.

Although Plaintiff clearly argues otherwise, neither of these conditions is met in this case.  The decision demonstrates that the ALJ made sufficient inquiry to become aware of the facts and of Plaintiff's version of the facts.  Moreover, as discussed above, the ALJ's decision to accord little weight to Nurse Practitioner Njoku's medical source

statement does not create an ambiguity or inconsistency which needs to be resolved.

Rather, it resolves a number of evidentiary inconsistencies, and Plaintiff has shown no

error in that resolution.  Further, Plaintiff does not point to evidence which would be

provided by a consultative examination and which is necessary to the determination of

this case.  He has shown no error in the ALJ's failure to recontact the treating medical

providers or to order a consultative examination.

## VII.   Hypothetical Questioning of the Vocational Expert

Plaintiff points to the rule that hypothetical questioning of a vocational expert (VE)

must include all impairments borne out by the evidentiary record.  (Pl. Br. 16) (citing

Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995)).  She notes that the VE testified that

if an individual were hostile to supervisors when corrected, all employment would be

precluded, and argues that the ALJ erred because she did not include any limitation with

regard to interaction with supervisors, either in her questioning of the VE or in her RFC

assessment "despite the overwhelming evidence that [P]laintiff could not get along with

the general public, coworkers, or supervisors."  (Pl. Br. 17).  The Commissioner argues

that the ALJ's reliance on the VE testimony was proper and that the ALJ's failure to

include a limitation that Plaintiff was hostile to supervisors was not error because she

properly did not accept such an extreme limitation.

The court agrees with the Commissioner.  As the Commissioner points out, one of

Plaintiff's former supervisors completed a report in which he noted that Plaintiff had

"some difficulty" accepting instructions and reasonable criticism (R. 382) but that he

could generally work without problems with only an ordinary amount of supervision and attention.  (R. 384).  With regard to Plaintiff's assertion that Plaintiff could not get along with the general public, coworkers, or supervisors, the ALJ found that Plaintiff could perform work involving no interaction with the public and co-workers.  However, she did not find any limitation in his ability to interact with supervisors, and Plaintiff cites no evidence supporting such a finding despite Plaintiff's assertion that there is "overwhelming evidence" of such limitations.  And, the court's review of the record revealed no such evidence.  Plaintiff has not met his burden to show a limitation in his ability to interact with supervisors.  Therefore, it was not error to fail to include such a limitation in either the hypothetical questioning of the VE or in the RFC assessed for Plaintiff.

Finally, Plaintiff argues that the representative jobs that the VE testified are available to an individual with the RFC assessed for Plaintiff do not actually meet the limitations assessed by the ALJ because they require SVP (specific vocational preparation) level 2--a requirement which is not compatible with the well-defined or simple tasks assessed by the ALJ; because two of the jobs have an "8" in the fifth digit of their Dictionary of Occupational Titles (DOT) codes, which indicates the job requires taking instruction and helping--requirements which are incompatible with the limitation to no interaction with co-workers, and because all three jobs require a general education development (GED) level of R2 requiring the ability to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions, and to deal

with problems involving a few concrete variables in or from standardized situations--

requirements which are incompatible with simple, rote, routine functions.

Leaving aside the fact that Plaintiff's argument plays fast and loose with the actual

limitations assessed by the ALJ ("The claimant can perform work independently with

well-defined tasks." (R.19)), his argument is without merit. The VE testified that each of

the jobs was available to an individual with the RFC assessed for Plaintiff. (R. 210). The

ALJ asked if the VE's testimony was consistent with the DOT, and she responded that

nothing was inconsistent but that she had additionally based her testimony on her 27 years

experience. (R. 212). The necessary implication of this exchange is that the expert

determined that the requirements of the jobs presented and the limitations assessed by the

ALJ are compatible. Plaintiff's assertions to the contrary are without any support in the

record. Moreover, his appeal to the DOT is equally flawed. The expert testified that her

testimony is not inconsistent with the DOT and that the requirements of these jobs fit

within the RFC presented in the hypothetical questioning. Yet, Plaintiff points to his lay

reading of the DOT and asserts that the VE testimony is incorrect because it is

inconsistent with information in the DOT. However, Plaintiff points to no record

evidence, or authority which is admissible in this case which establishes that his reading

of the DOT is correct and that the reading of a vocational expert with 27 years experience

is erroneous. The court finds no error. Moreover, at the hearing the ALJ specifically

discussed the "8" in the fifth digit of the DOT code, noted that it represents the "lowest

30

level of interaction" of jobs listed in the DOT, and testified that the three representative jobs to which she testified, satisfied that classification.  (R. 211).

Plaintiff has shown no error in the decision below.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 23rd  day of April 2015, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**